**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


RUBEN CUEVAS,                )
                                  )       Civil Action No. 09 – 43J
                Plaintiff,     )
                                  )
              v.            )       Chief Magistrate Judge Lisa Pupo Lenihan
                                  )
UNITED STATES OF AMERICA,    )
                                  )       ECF No. 84
              Defendant.    )
                                  )
                                  )


## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendant's Motion for Summary Judgment (ECF No. 84) filed on September 10, 2012. Plaintiff has filed a response in opposition to the motion, and, upon review of the pleadings and the documents in this case, the Court finds that Defendant is entitled to judgment in its favor.

## I.      PROCEDURAL BACKGROUND

Plaintiff is a federal prisoner who was confined at the Federal Correctional Institution in Loretto, Pennsylvania ("FCI-Loretto") from June 24, 2004, until he was transferred to the Federal Medical Center at Devens, Massachusetts ("FMC-Devens") on or about January 24, 2008. Plaintiff initiated this suit in June 2008 in the United States District Court for the District of Massachusetts under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.* ("FTCA"). Upon motion by the Defendant, it was transferred to this Court on February 20, 2009. In his Complaint, Plaintiff complained about the lack of medical treatment he received while he was confined at FCI-Loretto, after allegedly falling on May 17, 2007, and fracturing his

foot in several places. He alleged that his fractures went undiagnosed for several months while he suffered serious pain and was only minimally treated with pain killers and bandages. He alleged that a bone graft surgery was medically necessary to properly mend his foot, but, to date, he has not received the required surgery on his foot. He states that this lack of treatment has resulted in pain and suffering and that the medical staff at FCI-Loretto put him at serious risk by delaying treatment because he is a diabetic.

On October 6, 2009, Defendant filed a motion for summary judgment wherein it contended that Plaintiff's FTCA claims of medical malpractice must be dismissed because he failed to file a Certificate of Merit ("COM") substantiating his claims with expert medical testimony as required under Pennsylvania law. (ECF No. 35.) On April 29, 2010, this Court granted the motion and entered judgment in favor of Defendant and against Plaintiff. (ECF Nos. 43-45.) Plaintiff appealed the Court's ruling, and, on April 4, 2011, the Third Circuit Court of Appeals issued a non-precedential Opinion vacating judgment and remanding with instructions for a determination as to whether the COM as required by Pennsylvania law was applicable to a federal court action. (ECF Nos. 46, 55, 58.)

By Order dated April 7, 2011, this Court directed the Clerk of Court to make efforts to find an attorney willing to represent Plaintiff in this matter on a *pro bono* basis. (Text Order dated April 7, 2011.) After three requests for representation were declined, the Court directed the Clerk to reopen this case and to cease its efforts to find counsel. (ECF Nos. 57, 59-60, 62.) Defendant was ordered to file a brief addressing the issue raised in the Third Circuit's Opinion, that is, whether the COM requirement in the Pennsylvania Rules of Civil Procedure represents a point of substantive Pennsylvania law to be applied by federal courts in diversity or FTCA

actions. (ECF No. 62.) Plaintiff was granted an extension of time to obtain a COM regarding his claims until a ruling was made on this issue. Id.

By Order dated October 18, 2011, the COM briefing schedule was rescinded because the Third Circuit had resolved the issue in Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 264-65 (3d Cir. 2011) (holding that Pennsylvania Rule of Civil Procedure 1042.3 is a matter of substantive law and must be applied by federal courts to professional negligence claims). (ECF No. 63.) Plaintiff was then provided with an extension until January 18, 2012, to obtain a COM as required. Id. The time to file the COM was extended twice more with a final deadline established for July 15, 2012. (Text Orders dated January 4, 2012 and May 3, 2012.)

On June 19, 2012, Plaintiff filed a COM as an attachment to his Reply to the Defendant's Response regarding production of his medical records. (ECF No. 75-2.) The COM provided by Plaintiff indicated that he was proceeding under Pennsylvania Rule of Civil Procedure 1042.3(a)(3), which provides that "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against the defendant." Id.; see Pa. R. Civ. P. 1042.3(a)(3); see also Pa. R. Civ. P. 1042.9 (Certificate of Merit Form).

On June 22, 2012, Defendant filed a Motion to Strike Plaintiff's COM, which this Court granted by Order dated July 6, 2012. (ECF Nos. 77-78.) However, upon a Motion for Reconsideration filed by Plaintiff, and a stipulation by the Defendant, the Order was vacated on August 6, 2012. (ECF Nos. 79-83.)

On September 10, 2012, Defendant filed its Motion for Summary Judgment, along with a Brief in Support thereof, and a Concise Statement of Material Facts. (ECF Nos. 84-87.) Plaintiff filed his response in opposition to the motion and to the Concise Statement of Material Facts on October 15, 2012. (ECF Nos. 91-95.) The motion is now ripe for review.

## II.  FACTUAL BACKGROUND

Plaintiff is a federal prisoner who was designated to FCI-Loretto from June 24, 2004, until he was transferred to FMC-Devens on or about January 24, 2008.  (Declaration of Sandra Howard, M.D., Def.'s Ex. 1, ¶¶ 5, 103); (Plaintiff's Medical Records, Def.'s Ex. A, pp. 178, 239).[1]  Prior to his incarceration, Plaintiff was diagnosed with Type 2 Diabetes.  (Def.'s Ex. 1, ¶ 4).  On June 29, 2004, shortly after his arrival at FCI-Loretto, Physician Assistant ("PA") Robin Golden prescribed Glyburide and Metformin for treatment of his Type 2 Diabetes.  (Def.'s Ex. 1, ¶¶ 4, 5); (Def.'s Ex. A, p. 325).  On July 13, 2004, Plaintiff was seen by PA Golden for a renewal of his Glyburide and Metformin prescriptions.  (Def.'s Ex. 1, ¶ 6) (Def.'s Ex. A, pp. 322, 324).  After renewing his medication, PA Golden recommended following his blood sugar levels on a weekly basis.  (Id.)

On September 29, 2004, Plaintiff was examined by Dr. Leonard, the FCI-Loretto Clinical Director, as part of a routine chronic care clinic.  At that time, Dr. Leonard recommended that Plaintiff start taking subcutaneous injections of insulin to lower his blood sugar and prevent future health problems, but Plaintiff refused to begin insulin and signed the appropriate refusal form.  (Def's Ex. 1, ¶ 11); (Def.'s Ex. A, pp. 112, 316-319, 321).

During the time period between September 29, 2004, until July 14, 2006, Plaintiff was repeatedly educated regarding Dr. Leonard's recommendation to begin subcutaneous insulin injections to control his diabetes and prevent serious health problems that can result in death secondary uncontrolled diabetes.  (Def.'s Ex. 1, ¶¶ 8, 18, 22, 26, 28, 33, 37-38, 41, 44); (Def.'s Ex. A, pp. 322-23, 310-11, 306, 309, 302-05, 294-95, 297, 217-18, 290-91, 286-87, 289).

---

[1] Defendant's Appendix of Exhibits in support of its Motion for Summary Judgment is docketed at ECF No. 87 and will be referred to herein by the exhibit number.

During that time period, Plaintiff reiterated his refusal of insulin. (Def.'s Ex. 1, ¶¶ 11, 13, 16-18, 20, 22, 24, 26, 28, 33, 37); (Def.'s Ex. A, pp. 112, 110, 313, 309-11, 308-09, 302-07, 294-95, 297, 217-18).

Plaintiff had blood glucose levels (reference range: 70-110 mg/dL) as follows before he agreed to take insulin for his diabetes: 269 mg/dL on July 14, 2004; 252 mg/dL on November 23, 2004; 335 mg/dL on March 7, 2005; 306 mg/dL on April 14, 2005; 341 mg/dL on June 23, 2005; 325 mg/dL on August 29, 2005; 285 mg/dL on October 19, 2005; 335 mg/dL on February 16, 2006; 336 mg/dL on March 27, 2006; and 282 mg/dL on June 15, 2006. (Def.'s Ex. 1, ¶¶ 7, 12, 19, 21, 23, 25, 27, 40, 42, 45); (Def.'s Ex. A, pp. 362, 359-60, 356-57, 353-54, 351, 346-47).

Plaintiff had glycohemoglobin levels as follows before he agreed to take insulin for his diabetes: 11.5%A1C on July 24, 2004; 15.7%A1C on November 23, 2004; 13.4%A1C on March 7, 2005; 15.6%A1C on June 23, 2005; 16.0%A1C on October 19, 2005; 17.7%A1C on February 16, 2006; and 18.4%A1C on June 15, 2006. (Def.'s Ex. 1, ¶¶ 7, 12, 19, 23, 27, 40, 45); (Def.'s Ex. A, pp. 362, 359-60, 356, 353, 351, 346).

During the time period between September 29, 2004, until July 14, 2006, Plaintiff was repeatedly educated regarding the need for aerobic exercise and an appropriate diet for a diabetic. (Def.'s Ex. 1, ¶¶ 9, 11, 13, 18, 20, 28, 41, 43, 44); (Def.'s Ex. A, pp. 316-21, 323, 314-15, 308-11, 302-03, 291, 288, 286-87, 289).

On July 14, 2006, Plaintiff agreed to begin taking insulin for his diabetes and, on that date, he received his first eight units of NPH insulin at 9:15 a.m. (Def.'s Ex. 1, ¶ 48); (Def.'s Ex. A, pp. 284-85).

Plaintiff's commissary purchases from June 3, 2009, to September 15, 2009, indicate that he repeatedly purchased items inappropriate for a diabetic diet, including Ramen noodle soup,

Oreo cookies, candy bars such as Snickers, crackers, potato chips, and cookies. (Def.'s Ex. 1, ¶ 141); (Plaintiff's Commissary Purchases from June 3, 2009, to September 15, 2009, Ex. B).

On May 18, 2007, Plaintiff submitted a sick call request asking to be seen by medical staff because his leg and ankle were causing him pain. He explained that he had injured his foot two days prior. (Def.'s Ex. 1, ¶ 74); (Def.'s Ex. A, pp. 266-67).

Plaintiff was examined by PA Golden on May 18, 2007, who noted that Plaintiff reported twisting or inverting his left foot and ankle. Plaintiff also reported that he was using Motrin for his pain with no problems. (Def.'s Ex. 1, ¶ 74); (Def.'s Ex. A, pp. 262-65).

Plaintiff's medical records from PA Golden's examination on May 18, 2007, indicate that she observed localized edema (or swelling), ecchymosis (or bruising), and slight tenderness at the distal shaft of the first metatarsal, not involving the metatarsal phalangeal joint. She further noted that Plaintiff was ambulatory with a significant left limp and that his left medial ankle was slightly edemic with ecchymosis. (Def.'s Ex. 1, ¶ 74); (Def.'s Ex. A, pp. 262, 265).

Upon examination of Plaintiff on May 18, 2007, PA Golden noted that he had full range of motion in his ankle and foot and good sensation through his entire ankle and foot, including the metatarsal phalangeal joint. He also had a faint left PT pulse and a strong DP pulse, and she did not observe any ulcerations or open lesions. PA Golden observed slight tenderness of the distal first metatarsal but no bony deficit or crepitus. There was no increased warmth or erythema (or redness). PA Golden concluded that no x-ray was indicated. She diagnosed Plaintiff with a sprained ankle and with a foot contusion and she wrapped the ankle to reduce swelling. She directed Plaintiff to take Motrin as tolerated, rest, to elevate his ankle and to use warm compressions. She also gave Plaintiff an idle for three days so he did not have to work,

told him not to participate in sports for six weeks, and directed him to return to the clinic as needed for pain.  (Def.'s Ex. 1, ¶ 74); (Def.'s Ex. A, pp. 100, 262, 265).

On July 27, 2007, Plaintiff was seen by PA Golden for a follow-up to his complaint about ongoing diarrhea.  He also complained of continued mild lateral left ankle pain with movement and edema.  Upon examination, PA Golden observed that he had full range of motion in his left ankle with pain to palpation of the medial aspect, but she did not observe any erythema, and only slight edema.  Plaintiff had strong DP and PT pulses bilaterally.  She diagnosed a healing sprained left ankle but requested an elective left ankle x-ray to rule out an old hairline fracture. (Def.'s Ex. 1, ¶ 78); (Def.'s Ex. A, pp. 263).

Plaintiff had his left ankle x-rayed on August 14, 2007.  According to the radiologist who read the results, Dr. Anita Hawkins of the University of Maryland, he had "[a]bnormal comminuted fracture [of the] 1st metatarsal with medial and posterior displacement of the distal fragment.  [Fracture] 2nd metatarsal with lateral angulation.  [Fracture] 2nd – 4th metatarsal necks.  Bones osteopenic ankle and foot.  Vascular calcifications."  (Def.'s Ex. 1, ¶ 79); (Def.'s Ex. A, p. 198).

On August 14, 2007, Plaintiff was examined by Dr. Leonard at the request of the x-ray technician, and, upon examination of Plaintiff's left foot, Dr. Leonard observed swelling and bruising, noted that the toes appeared to have good color, intact capillary refill, and good movement and found that Plaintiff had a palpable left DP pulse and good sensation in his foot. (Def.'s Ex. 1, ¶ 80); (Def.'s Ex. A, pp. 260-61).

Following his examination, Dr. Leonard submitted an orthopedic consult and provided the following treatment to Plaintiff: he placed Plaintiff's left foot in a walking boot in order to immobilize it and gave him crutches so he could be non-weight bearing on the foot; he gave

Plaintiff a convalescent idle through September 15, 2006; he directed Plaintiff to avoid sports and prolonged walking and to rest in his cell with his left foot elevated; and he prescribed Motrin, 600mg every eight hours as needed for pain for one week.  (Def.'s Ex. 1, ¶ 80); (Def.'s Ex. A, pp. 99, 197, 260-61).

On August 24, 2007, Plaintiff was seen by PA Golden to follow-up on his left foot injury. Upon examination, she observed edema, slight erythema, and tenderness over all metatarsals of Plaintiff's left foot, and she directed Plaintiff to continue immobilizing his left foot in the walking boot and use crutches to remain non-weight bearing on his left foot.  (Def.'s Ex. 1, ¶ 83); (Def.'s Ex. A, p. 261).

On September 26, 2007, Plaintiff was examined by a consulting orthopedic doctor, Trevor W. Yardley, M.D.  According to Dr. Yardley, Plaintiff suffered from several injuries: "1. Fracture of the base of [t]he proximal portion of the first metatarsal with comminution.  2. Fracture of the base or proximal portion of the second metatarsal.  3.  Fracture of the distal portion of the fourth metatarsal neck.  4.  Fracture of the distal portion of the third metatarsal neck.  5.  Possible fracture of the second metatarsal neck distally.  The first and second metatarsals have not healed."  (Def.'s Ex. 1, ¶ 90); (Def.'s Ex. A, p. 202).

According to Dr. Yardley, the fractures of the first and second metatarsals had not healed and were displaced with angulation and what appeared to be nonunion.  He noted that Plaintiff had a history of diabetes and he appeared to have Charcot joint.[2]  In Dr. Yardley's opinion,

---

[2] Neuropathic arthropathy (or neuropathic osteoarthropathy), also known as Charcot joint or foot, refers to progressive degeneration of a weight bearing joint, a process marked by bony destruction, bone resorption, and eventual deformity.  http://en.wikipedia.org/wiki/Neuropathic_arthropathy (last visited August 19, 2013). The bones in the foot are weakened enough to fracture, and with continued walking, the foot eventually changes shape.  It can lead to severe deformity, disability, and even amputation.  http://www.foothealthfacts.org/footankleinfo/charcot-foot.htm?terms=charcot%20joint (last visited August 19, 2013).

because Plaintiff had failed four months of conservative treatment involving the use of a below-the-knee leg splint, he had two options: leave the foot alone or try to fix it with surgery, an open reduction, internal fixation with a bone graft. (Def.'s Ex. 1, ¶ 90); (Def.'s Ex. A, p. 201-02).

On November 21, 2007, the Utilization Review Committee recommended scheduling Plaintiff for foot surgery with a local surgeon, but it also recommended submitting him for a medical transfer. (Def.'s Ex. 1, ¶ 97); (Def.'s Ex. A, p. 196).

On December 14, 2007, Dr. Leonard requested that the Bureau of Prisons ("BOP") redesignate Plaintiff to a medical center as a Care Level III secondary to his severe foot fracture as he required follow-up care and surgery and suffered from complicating health issues. Plaintiff arrived at FMC-Devens on January 24, 2008. (Def.'s Ex. A, ¶¶ 101, 103); (Def.'s Ex. A, pp. 249, 239).

Plaintiff had his foot x-rayed on February 29, 2008, and, according to the radiologist who read the results, Dr. Rasim Oz of the University of Maryland, Plaintiff had a Charcot fracture – an abnormal incompletely healed fracture of the mid-first metatarsal with some callus formation – and severe atherosclerotic calcification of the arteries in his foot, as well as a deformity of the base of the second and third metatarsals. (Def.'s Ex. 1, ¶ 105); (Def.'s Ex. A, p. 364).

On March 11, 2008, Plaintiff was evaluated by an in-house orthopedic consultant, who opined that Plaintiff had charcot in his left foot with fractures, and surgery was not necessary. He further recommended Plaintiff receive a diabetic extra depth shoe from physical therapy, and a CT of the foot due to the possibility of nonunion fractures. (Def.'s Ex. 1, ¶ 108); (Def.'s Ex. A, p. 191).

---

Diabetes is the foremost cause in America today for neuropathic joint disease, and the foot is the most affected region. http://en.wikipedia.org/wiki/Neuropathic_arthropathy (last visited August 19, 2013).

On March 27, 2008, Plaintiff was evaluated by in-house Physical Therapist Taylor for a diabetic foot evaluation. As treatment, Plaintiff was fit with a medical shoe on the right and kept his previous cam walking boot on the left. (Def.'s Ex. 1, ¶ 109); (Def.'s Ex. A, pp. 398-400).

Plaintiff had a CT of his left foot on May 12, 2008. According to the radiologists who read the results, Drs. Carolyn Dupuis and Mona Korgaonkar of UMass Memorial, Plaintiff had: "1. Comminuted fracture of the navicular involving both articular surfaces, particularly the talonavicular articulation. Several fragments are located dorsally and there is some flattening of the lateral aspect of the talar aspect of the articulation. 2. Small bony fragment located in the sinus tarsi. 3. Deformity of the second and third metatarsals likely represents old healed fractures. 4. Irregularity and erosive changes at the first, second and third TMT joints, most pronounced at the 1st TMT. 5. If clinically indicated, consider MRI for further evaluation." (Def.'s Ex. 1, ¶ 116); (Def.'s Ex. A, pp. 8-9).

Plaintiff had another x-ray of his left foot on May 20, 2008. According to Dr. Thu Nguyen, a radiologist with the University of Maryland who read the results, Plaintiff had: "Abnormal no significant interval change. Incompletely healed fracture of the mid 1st metatarsal, though there is some callus formation. Old healed [fracture] of 4th metatarsal. Erosions at heads of 2nd – 4th metatarsals with mild deformity of the bases of the 2nd and 3rd metatarsals. Atherosclerotic calcification of the arteries." (Def.'s Ex. 1, ¶ 119); (Def.'s Ex. A, p. 10).

Also on May 20, 2008, Plaintiff was seen by the in-house orthopedic consultant for a follow-up on his left foot. According to the consultant, the fracture of the first metatarsal was now stable. He opined that Plaintiff was experiencing the progression of Charcot foot with a

midfoot collapse, and he recommended that Physical Therapy fit Plaintiff for a short leg boot which would relieve the medial tibia area. (Def.'s Ex. 1, ¶ 120); (Def.'s Ex. A, p. 184).

Plaintiff had another x-ray of his left foot on January 15, 2009. University of Maryland radiologist Dr. Baron Lane, who interpreted the x-ray, concluded that Plaintiff had a "slight increased collapse at the talonavicular joint and base of the first metatarsal; otherwise no significant changes." (Def.'s Ex. 1, ¶ 134); (Def.'s Ex. A, p. 35).

In light of the January 2009 x-ray, Nurse Practitioner ("NP") Seon-Spada concluded that there was no indication for a further referral for an orthopedic consultation at that time. Plaintiff would be followed as needed and at his chronic care appointments. (Def.'s Ex. 1, ¶ 134); (Def.'s Ex. A, p. 80).

On March 30, 2009, Dr. Martin withdrew a request he submitted on March 26, 2009 for crutches for Plaintiff. Based on the January 2009 x-ray, which showed a well-corticated first metatarsal fracture, Plaintiff's statement that he had no pain benefit from crutches, and his observation that the joint was stable, Dr. Martin decided to defer reinstating the use of crutches until after orthopedic followed-up with Plaintiff. (Def.'s Ex. 1, ¶¶ 136-37); (Def.'s Ex. A, pp. 81-84, 86).

On June 9, 2009, Plaintiff was seen by Physical Therapist Taylor for new medical shoes. He arrived to the appointment ambulating without an assistive device, in no apparent distress, and wearing institution protective toe boots. Mr. Taylor observed that Plaintiff had a normal gait and was able to walk at a quick pace while carrying on a conversation and, upon examination of Plaintiff's left foot, observed an obvious bony deformity – a bony thickening at his mid-foot and an apparent slight upward angulation of the distal metatarsal heads. There was no hypertrophic calluses, areas of skin breakdown, or apparent trauma. Mr. Taylor's notes from his clinical

encounter with Plaintiff on June 9, 2008, conclude that Plaintiff has: "[a]pparently stable (ie: healed) fracture, left foot. Excellent functional status (independent ambulation without gait deviation of need for assist. device). Some residual discomfort due to mechanical changes associated with how the multiple fractures healed, but no apparent major functional limitation." (Def.'s Ex. 1, ¶ 140); (Def.'s Ex. A, pp. 403-04).

## III.  STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact.  National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52).  If a court, having

reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324; <u>J.F. Feeser, Inc., v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990).

## IV.     DISCUSSION

Plaintiff brings his professional negligence claims under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq*. ("FTCA").  The FTCA allows private individuals to bring suits against the United States for torts committed by its employees acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b)(1); <u>Bialowas v. United States</u>, 443 F.2d 1047 (3d Cir. 1971).  Under the FTCA, the United States may be held liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  A federal district court addressing an FTCA action is required to apply the law of the state in which the alleged tortious conduct occurred.  28 U.S.C. § 1346(b)(1); *see* <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 700 (2000).  The complained of action in this case occurred at FCI-Loretto, which is located in Pennsylvania.  Thus, liability in this action will be determined by the laws of negligence and medical malpractice in Pennsylvania.  *See*, *e.g.*, <u>Wooding v. United States</u>, Civil Action No. 05-1681, 2007 U.S. Dist. LEXIS 22289, 2007 WL 951494, at *3, n.6 (W.D. Pa. Mar. 27, 2007).

Under Pennsylvania law, a plaintiff is required to show, by a preponderance of the evidence, that the defendant's negligence was the proximate cause of his injury.  <u>Baum v. United States</u>, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982).  Specifically, in order prevail on a medical

malpractice/negligence claim under Pennsylvania law, a plaintiff has the burden of establishing each of the following elements: (1) that there was a duty owed by the physician; (2) that there was a breach of that duty; (3) that the breach proximately caused the harm experienced by the plaintiff; and (4) that the plaintiff's damages directly resulted from the harm. *See* Quinby v. Plumsteadville Family Practice, Inc., 907 A.2d 1061, 1070 (Pa. 2006) (quoting Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa. 1997)); Mitzelfelt v. Kamrin, 584 A.2d 888, 892 (Pa. 1990). In addition, a plaintiff must present expert opinion attesting "to a reasonable degree of medical certainty," that the act of the physician or medical personnel "deviated from accepted medical standards, and that such deviation was the proximate cause of the harm suffered." Hakeem v. Salaam, 260 F. App'x 432, 434 (3d Cir. 2008) (citing Mitzelfelt, 584 A.2d at 892). *See also* Toogood v. Rogal, 824 A.2d 1140, 1145 (Pa. 2003) (holding that because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish a *prima facie* case of medical malpractice); Gindraw v. Dendler, 967 F. Supp. 833, 837 (E.D. Pa. 1997); Hoffman v. Brandywine Hosp., 661 A.2d 397, 399-400 (Pa. Super. Ct. 1995). The only exception to this requirement is when a matter "is so simple, and the lack of skill or want of care so obvious, as to be within the range of experience and comprehension of even nonprofessional persons." Toogood, 824 A.2d at 1145 n.14 (citing Chandler v. Cook, 265 A.2d 794, 796 (Pa. 1970)); Hightower-Warren, 698 A.2d at 54 n.1. The Pennsylvania Supreme Court has indicated that this "very narrow exception" is implicated only in instances of *res ipsa loquitur.* Toogood, 824 A.2d at 1145.

In support of summary judgment, Defendant argues that Plaintiff has failed to provide the requisite expert report or testimony necessary to establish his *prima facie* case of medical

negligence.  In this regard, Pennsylvania Rule of Civil Procedure 1042.3 requires a plaintiff to file a certificate of merit ("COM") attesting to at least one of the following:

> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

> (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

> (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa. R. Civ. P. 1042.3(a).  As previously explained, the Third Circuit has recently held that this COM requirement is a rule of substantive law and must be applied by federal courts in professional negligence cases.  Liggon-Redding, 659 F.3d at 264-65.

Plaintiff filed a COM on June 19, 2012, indicating that he seeks to proceed under subsection (3) of Rule 1042.3(a), which provides that "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim."  However, Defendant argues that expert testimony is necessary for Plaintiff to prove the elements of breach and causation.

In the case of McCool v. Dept. of Corrections, 984 A.2d 565 (Pa. Commw. Ct. 2009), the Commonwealth Court of Pennsylvania addressed a similar situation where the plaintiff had filed a COM stating that expert testimony was unnecessary to prosecute his claim of medical malpractice in connection with his conditions of mastocytosis and esophageal dysphagia.  There, the court stated:

> "[G]enerally when the complexities of the human body are involved expert testimony is required to aid the jury in reaching conclusions as to the cause of pain or injury."  The only time expert testimony will not be required for a medical malpractice claim is where the causal connection between the defendants'

allegedly negligent act and the harm suffered by the plaintiff is "generally a matter of common knowledge," rendering the jury "capable through its every day experience and knowledge of comprehending the facts presented and drawing conclusions based on those facts." Generally, such negligence rises to the level of gross incompetence.

In this case, [the plaintiff's] certificate of merit stated that expert testimony of an appropriate licensed professional was unnecessary to prosecute his claims. He is wrong. [The plaintiff's] ailments, mastocytosis and esophageal dysphagia, are complex and little known diseases. An ordinary layperson would be incapable of deciding whether [the defendant-doctor] had acted negligently without hearing from experts about [the plaintiff's] conditions. Accordingly, [the plaintiff] needed to file a certificate of merit attesting to the fact that a licensed professional had supplied him with a written statement that there exists a reasonable probability that [the plaintiff] was the victim of medical malpractice. [The plaintiff] did not do so, and the certificates of merit he filed are binding. Because [the plaintiff] could not pursue a claim against [the defendant-doctor] for professional malpractice without expert testimony, his complaint failed to state a claim, even as to [the defendant-doctor].

McCool, 984 A.2d at 571-72 (internal citations and footnotes omitted). More recently, the Middle District of Pennsylvania found that an inmate bringing a medical malpractice claim against his prison doctor for discontinuing his depression medication required expert medical testimony. Illes v. Beaven, Civil No. 1:12-CV-0395, 2012 U.S. Dist. LEXIS 95107, 2012 WL 2836581, at *4 (M.D. Pa. July 10, 2012). However, because the inmate had filed a certificate of merit stating that he did not need expert testimony for his claim, he was precluded from presenting the necessary testimony, and the prison doctor was granted summary judgment in his favor. Id.

The Court agrees that the medical issues presented in this case are not within the range of experience and comprehension of non-professional persons and that expert testimony is needed to prove Plaintiff's claim of medical negligence. Indeed, this Court has already stated that

[i]n this case, Plaintiff is attempting to prove that his fractured left foot should have been diagnosed on May 18, 2007, that the recommended surgery should have been performed and that, as a result of these delays, he suffered injuries

including a permanently deformed foot. Because this determination involves complex issues of medical care, the narrow exception does not apply to this case.

(ECF No. 43, p. 5). Having filed a COM stating that expert testimony is unnecessary pursuant to Rule 1042.3(a)(3), Plaintiff is bound by this certification and now prohibited from offering such testimony absent exceptional circumstances. *See* <u>Liggon-Redding</u>, 659 F.3d at 265 (stating that "the consequence of such a filing [under subsection (3) of Rule 1042.3(a)] is a prohibition against offering expert testimony later in the litigation, absent exceptional circumstances.") (quoting Pa. R. Civ. P. 1042.3(a)(3), Note; <u>Mertzig v. Booth</u>, Civil Action No. 11-1462, 2012 U.S. Dist. LEXIS 57857, 2012 WL 1431238, at *4 (E.D. Pa. Apr. 25, 2012) ("Rule 1042.3(a)(3) and its accompanying Note are clear and unambiguous. Absent exceptional circumstances, a party is bound by its certification and may not introduce expert testimony on the standard of care and causation."). The fact that Plaintiff is *pro se* and incarcerated does not present an exceptional circumstance that would allow him to introduce expert testimony at this time or at a later stage. *See* <u>Redding v. Estate of Sugarman</u>, Civil Action No. 07-4591, 2012 WL 1555454, at *2 (E.D. Pa. May 3, 2012) ("The Certificate of Merit rule applies equally to *pro se* and represented litigants."); <u>Illes</u>, 2012 WL 2836581, at *4 (*pro se* prisoner) (citing <u>McCool</u>, 984 A.2d at 571 (precluding *pro se* prisoner from presenting expert testimony after he filed a COM under subsection (3) of Rule 1042.3(a)). Consequently, Plaintiff is precluded from presenting the expert testimony that is needed for him to prevail on his medical negligence claim as against Defendant.

As previously noted, the narrow exception to the requirement of expert testimony in medical malpractice actions occurs in cases of *res ipsa loquitur*. "[R]es ipsa loquitur cases rely on the jury to fill in the missing pieces of causation and negligence, inherent in their cases, with

the jury's common experience." <u>Toogood</u>, 824 A.2d at 1149. However, the Pennsylvania Supreme Court has stated that "[*r*]*es ipsa loquitur* must be carefully limited, for to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury." <u>Id</u>.

Pennsylvania has adopted *res ipsa loquitur* as it is articulated in the Restatement (Second) of Torts § 328D. *See* <u>Quinby</u>, 907 A.2d at 1071. Under § 328D, it may be inferred that the harm suffered was caused by the negligence of the defendant when: (1) the event is the kind which does not ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates other possible causes, including the conduct of the plaintiff and third parties; and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff. <u>Mertzig</u>, 2012 WL 1431238, at *2. Before a plaintiff can invoke the doctrine of *res ipsa loquitur*, all three elements must be met to give rise to an inference of negligence. *See* <u>Toogood</u>, 824 A.2d at 1149-50 (holding that before *res ipsa loquitur* may be invoked, plaintiffs must meet the three § 328D conditions). After all three elements have been established, if reasonable persons may reach different conclusions regarding the negligence of the defendant, then it is for the jury to determine if the inference of negligence should be drawn. <u>Id</u>.; *see also* <u>Leone v. Thomas</u>, 630 A.2d 900, 901 (Pa. Super. Ct. 1993). However, "if there is any other cause to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant." <u>MacNutt v. Temple University Hosp., Inc.</u>, 932 A.2d 980, 987 (Pa. Super. Ct. 2007) (quoting <u>Fredericks v. Atlanta Refining Co.</u>, 127 A. 615, 617 (1925)).

Unfortunately, this is not a case where all possible causes of Plaintiff's progressive and lasting foot injuries can be eliminated, nor is it a case where such injuries do not ordinarily occur in the absence of negligence. Defendant avers that Plaintiff's diabetes may have, and likely, contributed to the medical issues related to his foot and there is substantial evidence in the record to suggest that his injuries are consistent with Charcot foot, and not with Plaintiff's fall at FCI-Loretto on May 17, 2007. Indeed, the medical issues presented in this case are clearly not so "simple" as to be within a layperson's "range of experience and comprehension." Thus, Plaintiff is unable to demonstrate an inference of negligence on the part of Defendant in order to fall within the "very narrow exception" to the general rule requiring expert testimony for professional negligence claims and without expert testimony Plaintiff cannot demonstrate liability on the part of the Defendant. The Court, therefore, reaffirms its previous holding and will grant Defendant's Motion for Summary Judgment accordingly.

On a final note, the Court is cognizant of the Third Circuit's instructions that it attempt to find counsel for Plaintiff on remand. The Court complied with these instructions and directed the Clerk to find a lawyer willing to represent Plaintiff in this matter. Three declinations were received before the Court reopened this case. The Court does not have unlimited resources by which to find counsel willing to undertake *pro bono* representation in any one of its many prisoner civil rights cases, and we are sympathetic to the fact that it could not be done in this case. However, after this case was reopened, Plaintiff was given a considerable amount of time (almost eight months) to obtain a COM and he was also informed that he was free to retain private counsel if he so desired. Plaintiff states that he was unable to do so because of his incarceration and because he could not get help from his family who do not live in this country. The Third Circuit has recognized the significant burdens faced by *pro se* prisoner-plaintiffs who

have the inability to pay for and obtain an expert witness, and cannot proceed in a civil action without expert testimony, but the rule applies to this type of litigant nonetheless. *See* Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d Cir. 1987). Furthermore, while Federal Rule of Evidence 706(a) provides that the "court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own choosing," F.R.E. 706(a), "[t]he policy behind this rule is to promote the jury's factfinding ability" Brown v. James, No. 4:CV-03-0631, 2008 U.S. Dist. LEXIS 17665, at *5 (M.D. Pa. March 6, 2008) (quoting Ford v. Mercer County Correctional Center, 171 F. App'x 416, 420 (3d Cir. 2006), and does not permit the Court to appoint an expert "for the purpose of aiding an indigent litigant, incarcerated or not," Kerwin v. Varner, No. 1:CV-03-2253, 2006 U.S. Dist. LEXIS 90691, at *7 (M.D. Pa. Dec. 15, 2006). While the Court is sympathetic to Plaintiff's situation, we are bound by the law of Pennsylvania, which, in this case, dictates that expert testimony is necessary to pursue Plaintiff's claim for medical malpractice. Therefore, judgment is entered in favor of the Defendant. An appropriate Order follows.[3]

**AND NOW**, this 21st day of August, 2013;

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 84) is **GRANTED**.

---

[3] The Court is aware that Plaintiff originally alleged both a negligence claim against the United States under the FTCA and an Eighth Amendment claim for deliberate indifference to a serious medical need pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) (entitling a plaintiff to sue for constitutional deprivations by federal officials). *See* ECF No. 3. His Bivens claim, however, was dismissed *sua sponte* by the United States District Court for the District of Massachusetts prior to transfer because the United States had not waived its sovereign immunity for such claim and therefore it was not cognizable. Id. Although Bivens claims are cognizable against federal officers and agents, had Plaintiff brought such a claim in this case it is clear that it would have nevertheless been meritless because the evidence of record does not support a claim of deliberate indifference. See the extensive treatment history set forth on pages 4 through 12. While the treatment may not have been what Plaintiff wanted, the deliberate indifference standard affords considerable deference to prison doctors and medical personnel in the diagnosis and treatment of medical problems on inmates and courts will not second-guess the adequacy of a particular course of treatment if it is a question of sound professional judgment. *See* Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). Accordingly, even though Plaintiff has not set forth a claim of deliberate indifference, the Court finds that such a claim would not succeed regardless.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Ruben Cuevas
    41121-018
    F.M.C. Devens
    P.O. Box 879
    Ayer, MA  01432-0879
    *Via U.S. Postal Mail*

    Counsel of Record
    *Via ECF Electronic Mail*